**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

TARRONE BARFIELD,
c/o Kramon & Graham, P.A.
750 East Pratt Street
Suite 1100
Baltimore, MD 21202
(County of Residence: Baltimore City)

Plaintiff,

v.

BALTIMORE POLICE DEPARTMENT,

Serve On:
Police Commissioner Richard Worley
601 E. Fayette Street
Baltimore, MD 21202

DETECTIVE DAVID W. NEVERDON,
3305 Richwood Ave.
Windsor Mill, MD 21244-2877

DETECTIVE JOHN G. THANNER,
1220 Glastonbury Way
Bel Air, MD 21014-3333

DETECTIVE ROBERT L. PATTON, Jr.,
7322 Prince George Rd.
Pikesville, MD 21207-4632

FIREARMS EXAMINER SANDRA BOHLEN,
102 Woolen Mill Rd.
New Park, PA 17352-9259

Defendants.

**Civil Action No.**

**JURY DEMAND**

**COMPLAINT AND JURY DEMAND**

**Introduction**

1. Plaintiff Tarrone Barfield lost more than twenty-six years of liberty for a murder that he did not commit and did not conspire to commit.

2. Mr. Barfield was arrested on July 31, 1997, held without bond, wrongfully convicted of conspiracy to commit murder in April 1998, sentenced to life imprisonment in July 1998, and released from custody on October 23, 2023, after the Circuit Court granted his petition for writ of actual innocence and the State dismissed the only remaining charge against him.

3. After his conviction was vacated and the prosecution dismissed, Mr. Barfield pursued compensation under the Walter Lomax Act. In that proceeding, after supplementation of the record with alibi testimony, an Administrative Law Judge of the Maryland Office of Administrative Hearings found by clear and convincing evidence that Mr. Barfield was not present at, involved in, or an accessory or accomplice to the shooting of fifteen-year-old Terrvon Davis on June 30, 1997.

4. Mr. Barfield was not wrongfully convicted by happenstance. His conviction resulted from a tainted and suspect-focused investigation, the suppression of exculpatory physical and documentary evidence, the concealment of a forensic report establishing that a pistol recovered from Addae Lawrence was the murder weapon—a disclosure that would have enabled the defense to investigate Lawrence and the different man known as "Monk" who supplied him with the pistol—and the maintenance of a false prosecution theory that Mr. Barfield was the armed "Monk" who shot Mr. Davis.

5. Defendants Detectives David W. Neverdon, John G. Thanner, and Robert L. Patton quickly focused on Mr. Barfield because Mr. Barfield used the nickname "Monk." Neverdon, Thanner, and Patton then shaped the investigation and fabricated evidence to support that theory,

relied on contaminated and unreliable eyewitness identifications, and failed to disclose evidence that undermined probable cause and pointed to another "Monk."

6. Defendant Sandra Bohlen, a firearms examiner in the Baltimore Police Department forensic laboratory, examined, documented, reported on, or otherwise participated in the forensic handling and suppression of the recovered murder weapon before trial. She knew or had reason to know that the recovered pistol had been matched to the shell casings from the Davis murder scene and that this information was favorable and material to Mr. Barfield.

7. Before Mr. Barfield's trial, BPD obtained a pistol from Addae Lawrence. Lawrence had received that pistol from a different man known as "Monk," who lived in a different part of Baltimore and had no known connection to Mr. Barfield. BPD testing matched that pistol to the six 9mm cartridge casings recovered from the Davis murder scene.

8. The murder-weapon evidence struck at the core of the prosecution case. The prosecution charged Mr. Barfield as the "Monk" who arrived with Simone Hall, confronted Terrvon Davis and his friends, pulled a gun, fired the shots, and thereby entered into a conspiracy to murder Mr. Davis. Disclosure of the recovery and forensic match would have enabled the defense to investigate Lawrence, discover that a different man known as "Monk" had supplied him with the pistol, and develop a mistaken-identity defense.

9. Defendants Neverdon, Thanner, Patton, and Bohlen withheld evidence from the prosecutor, Mr. Barfield, and his trial counsel, including the recovered weapon, the firearms match, the property records, the Lawrence information, and the forensic report. Defendants Neverdon, Thanner, and Patton also withheld from the prosecutor, Mr. Barfield, and his trial counsel a letter written by Simone Hall to Calvin Buckner that supplied impeachment evidence and investigative leads pointing away from the narrow prosecution theory against Mr. Barfield.

10. This action seeks redress under 42 U.S.C. Section 1983, the Maryland Declaration of Rights, and Maryland common law for the constitutional and tort injuries that Defendants caused.

**Jurisdiction and Venue**

11. This action is brought pursuant to 42 U.S.C. Section 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States, including the Fourth and Fourteenth Amendments.

12. This action also asserts claims under the Maryland Declaration of Rights and Maryland common law. This Court has supplemental jurisdiction over those claims pursuant to 28 U.S.C. Section 1367 because they arise from the same case or controversy as the federal claims.

13. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. Sections 1331 and 1343.

14. Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b) because the events giving rise to the claims occurred in the District of Maryland.

**Parties**

15. Plaintiff Tarrone Barfield is a resident and citizen of Maryland. He was wrongfully convicted in the Circuit Court for Baltimore City and was incarcerated until October 23, 2023.

16. Defendant Baltimore Police Department, referred to in this Complaint as "BPD" or the "Police Department," is a governmental entity responsible for policing Baltimore City. BPD is a person within the meaning of 42 U.S.C. Section 1983.

17. At all relevant times, BPD employed, supervised, trained, disciplined, and controlled Defendant Neverdon, Defendant Thanner, Defendant Patton, and Defendant Bohlen. BPD acted under color of state law.

18. Defendant David W. Neverdon was the initial primary detective in BPD assigned to investigate the homicide of Terrvon Davis. He is sued in his individual capacity. At all relevant times, he acted under color of state law and within the scope of his employment.

19. Defendant John G. Thanner was, at all relevant times, a detective in BPD assigned to investigate the homicide of Terrvon Davis with Detectives Neverdon and Patton. He is sued in his individual capacity. At all relevant times, he acted under color of state law and within the scope of his employment.

20. Defendant Robert L. Patton, Jr., was, at all relevant times, a detective in BPD assigned to investigate the homicide of Terrvon Davis with Detectives Neverdon and Thanner. He is sued in his individual capacity. At all relevant times, he acted under color of state law and within the scope of his employment.

21. Defendant Sandra Bohlen was, at all relevant times, a firearms examiner or forensic employee in the BPD forensic laboratory. She is sued in her individual capacity. At all relevant times, she acted under color of state law and within the scope of her employment.

22. Defendants Neverdon, Thanner, Patton, and Bohlen are collectively referred to as the "Individual Defendants."

## Factual Allegations

### The Davis Shooting

23. Shortly after midnight on June 30, 1997, fifteen-year-old Terrvon Davis was shot and killed on the 4700 block of Alhambra Avenue in Baltimore, Maryland.

24. Earlier that evening, Simone Hall, Cheryl Robinson, and Trudy Cooke had been involved in an altercation with neighborhood residents Sharonda McClain and Lakeisha Scott near 4722 Alhambra Avenue.

25. After the fight, people in the neighborhood discussed the incident. Terrvon Davis and others talked about Simone Hall having been beaten during the fight.

26. A car later drove down Alhambra Avenue and stopped near 4722 Alhambra Avenue and the adjacent alley. A man exited the car, sought out Simone Hall, and walked with her toward the house across the street where Dallas Taylor and Ms. Scott were on the porch.

27. The man asked Mr. Taylor to step off the porch and into the street. Mr. Taylor and Ms. Scott went inside the house. At that point, neither the man nor Simone Hall displayed a firearm.

28. The man then followed Simone Hall back across Alhambra Avenue. The man confronted Christopher Miller about whether he had been involved in the earlier fight with Hall.

29. Simone Hall approached Terrvon Davis, Azhar Lomax, and Obin Robinson, who were under a streetlight near the alley. Hall was armed with a large kitchen knife and flashed it in Davis's face while accusing him of having something to do with the fight.

30. The man then approached Davis, Lomax, and Robinson. Lomax stood between Davis and the man and told the man that Davis had nothing to do with the fight.

31. The man pulled a handgun from his pants and shot and killed Davis. Hall and the man then got back into the car, which sped away.

**Neverdon, Thanner, and Patton Focus on Mr. Barfield and Use Contaminated Identification Evidence**

32. Later on June 30, 1997, Neverdon, Thanner, and Patton received anonymous information that Simone Hall had been involved in the earlier fight, that Hall had later pointed out Davis to another person, and that the person shot Davis.

33. Neverdon, Thanner, and Patton also received anonymous information that the shooter was known as "Monk." One anonymous report referenced by Neverdon on June 30, 1997,

described the shooter as Simone Hall's cousin. Neverdon described Simone Hall as Mr. Barfield's "girlfriend" in the application for statement of charges filed by Neverdon on July 3, 1997.

34. Detective Lenny Willis was familiar with Mr. Barfield from a prior non-violent drug conviction and knew that Mr. Barfield used the nickname "Monk." Willis relayed that information to Defendant Neverdon as the primary detective for the Davis homicide. Neverdon shared the information with Thanner and Patton.

35. Neverdon, Thanner, and Patton quickly focused on Mr. Barfield because of the nickname "Monk" and pursued a theory that Mr. Barfield was the armed man who accompanied Simone Hall. Upon information and belief, Neverdon—as the primary detective for the Davis homicide—prepared the photo array. The photo array unnecessarily and improperly suggested Mr. Barfield as the suspect. Upon information and belief, Patton also used and relied on the photo array knowing that it unnecessarily and improperly suggested Mr. Barfield as the suspect.

36. In addition, Neverdon and Patton used practices that increased the risk of misidentification. To start, Neverdon placed Mr. Barfield in a photo array without a reliable evidence-based suspicion to link him to the Davis murder. On July 3, 1997, Neverdon and Patton interviewed Cheryl Robinson about the Davis murder and obtained a non-identification from her. Still, they continued to place Mr. Barfield at risk of a misidentification by showing the unnecessarily suggestive photo array to Azhar Lomax later on July 3, 1997.

37. Neverdon and Patton conducted the identification procedure with Lomax knowing which photo depicted the suspect Mr. Barfield. Neverdon and Patton failed to document Lomax's description of the suspect before showing the witness the array. Neverdon and Patton failed to record a contemporaneous statement of confidence by the witness. Neverdon and Patton provided confirmatory feedback to Lomax that erroneously bolstered Lomax's confidence at trial.

38. As a result of these practices, on July 3, 1997, Azhar Lomax misidentified Mr. Barfield as the suspect from the suggestive photo array. Lomax later testified that he believed the shooter looked familiar but did not initially remember why. Instead of investigating the risk of a misidentification, Neverdon and Patton improperly suggested and confirmed Lomax's selection of Mr. Barfield.

39. Although Neverdon and Patton had obtained only one purported identification—which they knew was unreliable—Neverdon applied, under oath, for a statement of charges that charged Mr. Barfield with first-degree murder of Mr. Davis. In Neverdon's application for statement of charges, he falsely implied that multiple witnesses identified Mr. Barfield.

40. In the absence of a reliable identification of Mr. Barfield, upon information and belief, Neverdon provided information to the Afro-American newspaper to include in a story about the Davis homicide. Neverdon is quoted in the story as stating, "The suspect walked up to Terrvon, words where [sic] exchanged, and he pulled out a gun. Terrvon was hit twice in the back as he ran." The story included Mr. Barfield's photograph and identified him as the suspect charged with the murder.

41. On July 12, 1997, the Baltimore Afro-American published a front-page article prominently featuring Mr. Barfield's photograph and reporting that he had been charged with first-degree murder in Davis's death. After the story was published, Neverdon then relied on witnesses' viewing of Barfield's "wanted" photograph in the Afro-American without testing or confirming the reliability of the purported identification.

42. On July 15, 1997, Neverdon interviewed Ms. Scott about her knowledge of the Davis homicide and the fight that preceded it. Neverdon interviewed Ms. Scott before recording her statement but did not document the initial statement. In the recorded interview, Ms. Scott

relayed that during the fight preceding the homicide, her boyfriend (Mr. Taylor) had grabbed Simone Hall because she was hitting another girl with a broomstick. Ms. Hall stated that she was coming back. Later that same evening, Ms. Scott and Mr. Taylor were standing on the front porch of a nearby house on Alhambra Avenue. Without documenting Ms. Scott's description of the vehicle or the people who got out of the vehicle, Neverdon asked her if the vehicle was "burgundy." Neverdon asked only what the male who exited the vehicle and approached Ms. Scott on the front porch was wearing. Ms. Scott stated, "[a]ll black and a black cap." Neverdon then asked Ms. Scott whether she had seen "the recent article in the Afro newspaper that-that told the story of Draino's [Mr. Davis'] murder?"

43. Neverdon stated, "[t]he picture of the guy that's in the newspaper um you said that he didn't have a hat on in the newspaper article, but with the exception of not having the hat and the complexion, that is a the face of the guy that you saw get out of the car and come over to you and Dallas [Mr. Taylor]?" Ms. Scott answered, "Yes." On information and belief, based on Neverdon's recorded reference to a difference in complexion, Scott had provided information during the preliminary interview indicating that the person she observed differed in complexion from the person depicted in the newspaper photograph.

44. On September 30, 1997, Neverdon also relied on the purported identification made by Mr. Taylor, Ms. Scott's boyfriend, of Mr. Barfield based on his "wanted" photograph in the Afro-American newspaper story that identified him as a suspect.

45. Mr. Taylor and Ms. Scott misidentified Mr. Barfield.

46. On August 7, 1997, Neverdon interviewed Christopher Miller about the Davis homicide. Neverdon conducted an unrecorded initial interview but did not document any physical description of the suspect by Miller. After seeing the newspaper article, Miller answered "yes"

when Neverdon asked whether he had "definitely identified [Hall and Mr. Barfield] from the article … in the Afro Newspaper?" At trial, Miller testified that Mr. Barfield "looked like" the man who pulled the trigger, although Miller had only seen a side view of the shooter. Mr. Miller misidentified Mr. Barfield.

47. On September 21, 1997, Neverdon and Thanner interviewed Obin Robinson. When first interviewed soon after the murder, Robinson did not identify Mr. Barfield (or anyone) as the shooter. Still, Detectives Neverdon and Thanner interviewed Robinson about the Afro-American newspaper edition with photographs of Simone Hall and Mr. Barfield identified as "suspects" in the murder of Davis. Neverdon asked Robinson, "Now as far as this photograph of Mr. Barfield is concerned, would you say that this is a reasonable ah resemblance of the person that you saw that shot and killed Mr. Davis?" Only then did Robinson answer, "Yes, I will." At trial, Robinson testified that the photograph in the Afro-American newspaper article looked "something like" the shooter. Mr. Robinson misidentified Mr. Barfield.

48. On March 31, 1998, approximately nine months after the shooting, and after the Individual Defendants suppressed the murder weapon, and after Neverdon, Thanner, and Patton suppressed the Hall letter, Patton interviewed Donte McCallum. Patton interviewed McCallum at least twice on March 31, 1998, but recorded only the final statement. Patton did not ask McCallum during the recorded interview about the newspaper article and its prominent photograph of Mr. Barfield. On April 1, 1998, Patton conducted a photo array procedure with McCallum. Patton conducted the procedure knowing which photograph in the array depicted Mr. Barfield. McCallum identified two different photographs as possibly depicting the shooter: one depicting Mr. Barfield and the other depicting another person. At trial, McCallum admitted that he knew about the news

story, that it contained photographs of the people who were wanted for the Davis murder, and that he had read it. Still, McCallum claimed that he did not look at the photographs in the news story.

49. McCallum incorrectly selected Barfield as one of two possible shooters.

50. The identification evidence was further compromised by delay, stress, limited opportunity to observe, the presence of weapons, and the witness-focused pressure created by repeated exposure to Mr. Barfield's image as the charged suspect.

51. Despite these problems, Neverdon, Thanner, and Patton treated the contaminated and uncertain identifications as reliable evidence of guilt. Neverdon, Thanner, and Patton failed to disclose the full extent of the contamination, uncertainty, delay, and suggestive procedures to prosecutors and the defense.

52. When Mr. Barfield was arrested on July 31, 1997, no firearm, ammunition, or physical evidence connecting him to the Davis shooting was recovered.

**The Withheld Hall Letter**

53. On or about July 8, 1997, Simone Hall mailed a letter dated July 4, 1997, to Calvin Buckner, a romantic partner of Hall.

54. Buckner had been suspected in an earlier shooting allegedly connected to Hall.

55. In the letter, Hall wrote that she had been "at the wrong place at the wrong time," that she was "in a fight and somebody got killed," that "people" had put her name into something she claimed she had no idea about, and that she was going to take a "vacation."

56. Hall also wrote to Buckner, "I know & remember that you are going to turn yourself in," and she referred to information a mutual acquaintance would provide to him because she had spoken to that person when she could not reach Buckner.

57. The Hall letter was favorable to Mr. Barfield because it supplied impeachment evidence and investigative leads about Hall's motive, Hall's role, Hall's relationship with Buckner, Buckner's possible knowledge of related events, Hall's potential flight, and alternative explanations for the shooting.

58. The Hall letter also undermined the prosecution's narrow theory that Mr. Barfield was the person Hall summoned and that Mr. Barfield conspired with her to murder Davis.

59. Neverdon, Thanner, and Patton had access to and knew of the Hall letter, but failed to disclose it to prosecutors, Mr. Barfield, or his trial counsel before trial.

**BPD Recovers the Murder Weapon from Lawrence and Withholds the Forensic Match**

60. On or about December 5 or 6, 1997, approximately four months after Mr. Barfield's arrest and before his trial, BPD recovered a 9mm pistol from Addae Lawrence.

61. Lawrence had received the pistol earlier on the day of his arrest from a man in his neighborhood who was also known as "Monk."

62. The "Monk" who gave Lawrence the pistol was not Mr. Barfield. He lived in the vicinity of Lafayette Avenue and Durham and Wolfe Streets, away from Alhambra Avenue, and had no known connection to Mr. Barfield.

63. Lawrence did not know Mr. Barfield, did not know the people involved in the June 29 fight or June 30 shooting, and did not receive the pistol from Mr. Barfield.

64. BPD generated property and firearms records concerning the pistol, including an operability report, property receipt, request for examination, and supplemental firearms comparison report.

65. On or about January 16, 1998, BPD forensic testing matched the pistol recovered from Lawrence to the six 9mm cartridge casings recovered from the Davis murder scene.

66. On January 16, 1998, Bohlen signed, as co-examiner, the supplemental firearms report concluding that the six cartridge casings recovered from the Davis murder scene were fired from the pistol recovered from Lawrence. Mark Takacs signed as examiner. The report was addressed to Detective Neverdon. Neverdon received the report.

67. Upon information and belief, Thanner and Patton received the supplemental firearms report concluding that the six cartridge casings recovered from the Davis murder scene were fired from the pistol recovered from Lawrence.

68. The firearms match and related property records were material, exculpatory, and impeaching evidence. Neverdon, Thanner, and Patton suppressed this evidence. Suppressing the firearms match and related property records prevented the defense from investigating Lawrence and learning that a different man known as "Monk" had supplied him with the pistol. That discovery would have undermined the theory that Mr. Barfield was the armed "Monk" who shot Davis.

69. The firearms match also supplied powerful investigative leads. Had the recovery of the weapon been disclosed before trial, defense counsel could have investigated Lawrence, learned of and investigated the other "Monk" in the Lafayette-Durham-Wolfe area, traced the gun's chain of possession, and examined BPD property and laboratory records.

70. At some time prior to Mr. Barfield's trial, BPD transferred Neverdon from the Homicide Division. After his transfer, Neverdon went on medical leave and had knee surgery. At the time of Mr. Barfield's trial, Neverdon was on medical leave.

71. Neverdon, Thanner, and Patton knew before trial that BPD had recovered and tested the murder weapon. The firearms report was transmitted to Neverdon and placed in BPD files.

Thanner and Patton knew of the report while investigating the Davis murder and preparing the case for trial.

72. Bohlen knew before trial that BPD had recovered the murder weapon and that the recovered pistol had been forensically matched to the Davis shell casings. Upon information and belief, Bohlen suppressed the firearm match and related documents from the prosecution and the defense.

73. Despite this knowledge, the Individual Defendants did not disclose the recovered weapon, the firearms comparison report, the property records, or the Lawrence information to Mr. Barfield, his trial counsel, and, upon information and belief, the prosecutors responsible for ensuring disclosure to the defense.

74. The suppression was not negligent or inadvertent. The Individual Defendants knew the evidence was favorable and material because it contradicted the prosecution's theory that Mr. Barfield possessed and used the murder weapon.

75. The suppression allowed the Individual Defendants and the prosecution to proceed on the false and misleading premise that the murder weapon had not been recovered and that there was no physical evidence pointing away from Mr. Barfield. The suppression prevented the defense from discovering the existence of the other "Monk" who supplied Lawrence with the firearm used in the Davis murder.

**Trial and Conviction**

76. Mr. Barfield was tried in the Circuit Court for Baltimore City in April 1998 on charges including first-degree murder, second-degree murder, conspiracy to commit murder, and use of a handgun in a crime of violence.

77. The prosecution case depended on identifying Mr. Barfield as the armed "Monk" who accompanied Simone Hall, confronted Davis and his friends, drew the pistol, and fired the shots that killed Davis.

78. No physical or forensic evidence connected Mr. Barfield to the shooting, and he had not confessed.

79. The prosecution instead relied on eyewitness-identification evidence that had been contaminated by the actions of Neverdon, Thanner, and Patton, together with a misleading absence of disclosed physical evidence pointing to another suspect.

80. The withheld firearms evidence would have permitted defense counsel to cross-examine Bohlen and other BPD witnesses; expose the false premise that the murder weapon had not been recovered; undermine the identification evidence; and argue that a different "Monk" had possessed the murder weapon.

81. When called as an expert witness at trial, Bohlen inaccurately testified that police had not recovered the murder weapon.

82. Mr. Barfield does not seek damages from Bohlen based on the act of trial testimony itself. Her testimony is alleged as background and as a foreseeable consequence of her non-testimonial forensic, investigative, reporting, and concealment conduct before trial.

83. On April 29, 1998, after a jury trial and extended deliberations, the jury convicted Mr. Barfield of conspiracy to commit murder. The jury did not convict him of murder or handgun use; the trial court declared a mistrial on the remaining counts, and the State later entered a nolle prosequi on those counts.

84. The trial court sentenced Mr. Barfield to life imprisonment for conspiracy to commit murder.

85. The conspiracy conviction rested on the same false premise that infected the homicide charges: that Mr. Barfield was the armed "Monk" who came with Hall, confronted Davis, and used the murder weapon. The suppressed weapon evidence would have struck directly at that premise.

**Postconviction, Actual Innocence, Dismissal, and Lomax Act Findings**

86. For decades, Mr. Barfield maintained that he was innocent and had nothing to do with the shooting of Terrvon Davis.

87. On or about December 16, 2022, Mr. Barfield filed a petition for writ of actual innocence. The petition relied on newly discovered evidence, including the suppressed murder-weapon evidence and the suppressed Hall letter.

88. On March 6, 2023, the Baltimore City State's Attorney conceded that the Hall letter, the firearms report identifying the pistol recovered by police before trial, and the murder weapon itself had been improperly withheld from Mr. Barfield before trial. The Baltimore City State's Attorney agreed that this evidence pointed to Mr. Barfield's actual innocence.

89. In August 2023, the Circuit Court for Baltimore City granted Mr. Barfield's petition for writ of actual innocence, vacated his conviction and sentence, and ordered a new trial.

90. In granting relief, the Circuit Court described the suppression of the firearms report and information concerning the murder weapon as an "egregious omission" and "beyond troubling."

91. On October 19, 2023, the Baltimore City State's Attorney's Office entered a nolle prosequi to the only remaining count in the indictment, conspiracy to commit murder.

92. On October 23, 2023, Mr. Barfield was released from custody.

93. Mr. Barfield then pursued compensation under the Walter Lomax Act. In that proceeding, the parties stipulated that the Baltimore City Police Department withheld from Mr. Barfield the firearms comparison report identifying the murder weapon, that the Hall letter had been withheld by the State, and that Bohlen inaccurately testified that police had not recovered the murder weapon.

94. In the Lomax Act proceeding, the Administrative Law Judge found by clear and convincing evidence that the "Monk" who provided the recovered murder weapon to Lawrence was not Mr. Barfield.

95. The Administrative Law Judge credited Lawrence's testimony that he received the firearm from another "Monk" and did not know Mr. Barfield or the people involved in the fight or shooting.

96. The Administrative Law Judge also credited the alibi testimony of Taneka Merrill. Merrill testified that on the night of June 29, 1997, Mr. Barfield came to her home with a woman known as "Pooh," remained there overnight while Merrill went to work, and was still there when Merrill returned in the morning.

97. The Administrative Law Judge found that Mr. Barfield remained at Merrill's home until at least approximately 7:00 a.m. on June 30, 1997, and therefore was not present at or involved in the shooting of Davis in the early morning hours of June 30, 1997.

98. The Administrative Law Judge further found that Mr. Barfield did not commit or suborn perjury, did not fabricate evidence, and did not cause or bring about his own conviction.

99. After sentencing, Mr. Barfield spent 25 years, 3 months, and 11 days in prison on the conspiracy conviction. From arrest through release, he lost more than 26 years of liberty.

**Baltimore Police Department Policies, Practices, and Customs**

100. The constitutional violations that caused Mr. Barfield's wrongful prosecution, conviction, and imprisonment were not isolated events. They were caused by BPD policies, practices, customs, and failures to train, supervise, and discipline.

101. By 1997 and 1998, BPD had longstanding customs and practices in homicide investigations that included rushing to judgment, pursuing suspect-focused theories, failing to document exculpatory information, failing to maintain complete homicide files, failing to transmit all material evidence to prosecutors, and failing to disclose Brady material to the defense.

102. BPD's policies and customs allowed homicide detectives to function as gatekeepers over what information would be placed in the prosecution file and what information would be disclosed, without reliable supervision, audit, or cross-checking of homicide files, property records, and laboratory reports.

103. BPD also failed to train firearms examiners and other forensic personnel that they had independent obligations to disclose exculpatory and impeachment evidence, to document materially exculpatory forensic findings, and to ensure that laboratory reports contradicting the prosecution theory reached prosecutors and the defense.

104. BPD failed to implement procedures requiring that ballistics reports, property receipts, operability reports, supplemental reports, and chain-of-custody records be reconciled with homicide files and transmitted to prosecutors whenever they related to a pending prosecution.

105. BPD permitted or condoned identification practices that contaminated witnesses and increased the risk of false identifications, including failing to require reliable evidence before placing a person in a suspect line-up, failing to document witness descriptions, conducting "off-the-record" interviews before formally interviewing a witness, showing witnesses media reports

naming the suspect, conducting delayed procedures after media exposure, failing to use neutral and blind procedures, and failing to document uncertainty, contamination, and suggestiveness.

106. BPD policymakers knew or should have known that these customs and failures were likely to cause wrongful prosecutions and convictions, including convictions based on suppressed exculpatory evidence and fabricated or unreliable witness evidence.

107. BPD had notice of these problems from prior and contemporaneous cases involving suppressed exculpatory evidence, buried police reports, flawed homicide investigations, coerced or unreliable witness evidence, and wrongful convictions.

108. For example, in the prosecution of Walter Lomax, BPD failed to disclose reports showing that an eyewitness identified someone else as the gunman and that another witness described a gunman who did not match Lomax.

109. In the prosecution of Wendell Griffin, exculpatory documents later found in BPD files included reports showing that key witnesses had failed early in the investigation to identify Griffin as the perpetrator.

110. In the prosecution of James Owens, BPD detectives withheld evidence of inconsistent statements by the State's key witness.

111. In the prosecution of Sabein Burgess, BPD withheld exculpatory information, including information from the FBI and a witness statement that the killers were not Burgess.

112. In the prosecution of Antoine Pettiford, BPD officers failed to disclose exculpatory evidence indicating that Pettiford was not involved in the murder.

113. On information and belief, these and other cases reflected the same BPD policies and customs that caused the violations in Mr. Barfield's case: incomplete files, buried reports, non-disclosure of favorable evidence, suspect-focused investigations, failure to train homicide

detectives and laboratory personnel, and failure to supervise homicide detectives and forensic personnel.

114. In January 2000, Stephen B. Tabeling prepared for Police Commissioner Ronald L. Daniel a report entitled *The Homicide Unit of the Baltimore Police Department: An Overview of Operational and Administrative Policies, Practices and Procedures* (the "Tabeling Report"). Acting as a consultant, Tabeling interviewed investigative and leadership personnel, reviewed administrative procedures and operational policies and practices, and consulted members of the State's Attorney's Office. The report examined "systemic failures" within the Homicide Unit and recommended changes to its training, supervision, investigative practices, and administration. (Tabeling Report at 1, 3.)

115. The Tabeling Report identified the following deficiencies and recommended corresponding corrective measures:

**(a) Case-folder management.** The report stated that "case folders are in abysmal condition—that is when they can be located." It identified an urgent need for workable controls over the assembly, storage, retrieval, and confidentiality of case folders, described existing practices as verging "on the chaotic," and stated that security was "non-existent." These deficiencies concerned files containing the histories of extensive investigations and potentially case-closing information. (*Id.* at 6–7.)

**(b) Investigative training and documentation.** The report found that replacements for experienced investigators frequently lacked requisite investigative skills and sufficient knowledge of the law and departmental procedures, and that no mechanism adequately and formally trained those new members. It characterized that deficiency as a "systemic failing." The report also described reliance on on-the-job training as inadequate and as

carrying a risk of passing investigators' bad habits to new detectives. Its preliminary assessment identified deficiencies in case-folder management, statement analysis, field reporting, note taking, and follow-up, and its assessment of attendees at the fall 1999 Homicide School identified gaps in basic legal and investigative concepts. (*Id.* at 4, 6–7.)

**(c) Supervisory review and coordination with laboratory personnel.** The report recommended supervisory training concerning report review, regular inspections, reporting requirements, crime-scene supervision, and coordination within BPD and with prosecutors. It also stated that it was vital for Laboratory Division personnel to provide training and train together with Homicide Unit detectives and shooting investigators, and recommended that supervisory and command personnel attend the same training. (*Id.* at 7.)

**(d) Witness interviews and communication with prosecutors.** The report found that some investigators had not mastered the skills necessary to conduct interviews yielding usable statements. It separately identified an apparent mutual lack of confidence and a serious deficiency in teamwork between Homicide Unit personnel and the State's Attorney's Office, and recommended improved communication and joint training. (*Id.* at 5, 7–8.)

**(e) Leadership instability.** The report described the loss of experienced investigators and potential mentors through an earlier rotation policy, which it stated was no longer in effect. It also identified instability in supervisory assignments, reporting that five majors, eight lieutenants, and eight sergeants had been assigned within fewer than three years. It attributed fragmented attention to the Unit's strategic goals to that instability and concluded that there had been a "failure of leadership, at all levels." (*Id.* at 4, 9.)

116. On information and belief, the file-management, reporting, training, and supervisory deficiencies described above existed during the 1997–1998 Davis homicide investigation and prosecution, as reflected in the recurring misconduct and incomplete investigative files alleged in the preceding paragraphs. The January 2000 report provides later documentation consistent with those preexisting deficiencies: it describes the effects of an earlier rotation policy, prior supervisory instability, and the transmission of deficient investigative practices through on-the-job training. Plaintiff relies on those retrospective observations, together with the earlier incidents and practices alleged above, as support for the existence and persistence of the institutional deficiencies during the relevant period.

117. On information and belief, before and during Mr. Barfield's investigation and prosecution, BPD policymakers were deliberately indifferent to the recurring failures of documentation, file management, report review, training, and supervision alleged above and the resulting risk that material favorable evidence would be withheld. They failed to institute and enforce effective procedures for assembling complete investigative files, reviewing reports, reconciling homicide and laboratory records, and transmitting favorable evidence to prosecutors. Those failures, together with BPD's custom of permitting suppression of favorable evidence, allowed the Individual Defendants' deliberate withholding of the firearms match and other favorable evidence alleged above to occur without supervisory detection or correction and were a moving force behind Mr. Barfield's wrongful conviction and imprisonment.

118. The constitutional violations in Mr. Barfield's case were a direct and foreseeable result of these BPD policies, practices, customs, and failures.

**Damages**

119. Mr. Barfield spent the prime of his life incarcerated for a crime he did not commit and did not conspire to commit.

120. During his wrongful incarceration, Mr. Barfield was separated from his family, loved ones, friends, and community. He missed holidays, funerals, family milestones, and ordinary life experiences that can never be restored.

121. Mr. Barfield was forced to live for decades in prison conditions that were restrictive, dangerous, isolating, and dehumanizing.

122. Mr. Barfield lost the ability to live as an autonomous adult, to pursue ordinary relationships, to work freely, to build a career, to participate in his community, and to make basic decisions about his daily life.

123. Mr. Barfield suffered and continues to suffer physical, psychological, and emotional injuries, including pain, anxiety, grief, humiliation, fear, loss of reputation, loss of earning capacity, and difficulty adjusting to life outside prison after more than twenty-six years of confinement.

124. Mr. Barfield has not received full compensation for the enormous injuries caused by Defendants' misconduct.

125. On or about February 9, 2024, Mr. Barfield sent a notice of claim to the Baltimore City Solicitor pursuant to the Local Government Tort Claims Act.

**COUNT I - 42 U.S.C. Section 1983**

**Violation of Due Process - Suppression of Exculpatory and Impeachment Evidence**

**(Against Individual Defendants)**

126. Each preceding paragraph is incorporated as if fully restated herein.

127. The Individual Defendants, acting individually, jointly, and in concert under color of law, deprived Mr. Barfield of his right to due process and a fair trial by suppressing favorable, material exculpatory and impeachment evidence.

128. The suppressed evidence included the recovered murder weapon, the firearms comparison report matching that weapon to the Davis shell casings, property and chain-of-custody records concerning the weapon, the Lawrence arrest information, and the Hall letter and related investigative leads.

129. The evidence was favorable because it undermined the central prosecution theory that Mr. Barfield was the armed "Monk" who shot Davis and conspired with Hall, and because it would have supplied impeachment evidence and alternative-suspect investigative leads.

130. The evidence was material because there is a reasonable probability that disclosure would have changed the result of trial. At a minimum, disclosure would have allowed the defense to investigate the other "Monk," cross-examine BPD witnesses, expose the false premise that the murder weapon was unrecovered, challenge the reliability of the identifications, and undermine the conspiracy count.

131. The Individual Defendants suppressed the evidence in bad faith. They knew or recklessly disregarded that the evidence was favorable and material, and they intentionally or recklessly failed to disclose it despite their constitutional obligations.

132. As a direct and proximate result, Mr. Barfield was wrongfully prosecuted, convicted, imprisoned, and deprived of liberty for more than twenty-six years.

133. The Individual Defendants' misconduct was intentional, malicious, reckless, and undertaken with willful indifference to Mr. Barfield's clearly established constitutional rights.

**COUNT II - 42 U.S.C. Section 1983**

**Violation of Due Process - Fabrication of Evidence and Deliberately Misleading Investigative Evidence**

**(Against Individual Defendants)**

134. Each preceding paragraph is incorporated as if fully restated herein.

135. The Individual Defendants, acting individually, jointly, and in concert under color of law, deprived Mr. Barfield of liberty through fabricated, false, and deliberately misleading evidence.

136. Neverdon, Thanner, and Patton fabricated and maintained a misleading investigative case by treating contaminated, uncertain, and suggestively procured identifications as reliable evidence while concealing facts that undermined those identifications. To bolster identification evidence as reliable when it was not, Neverdon, Thanner, and Patton used the technique of interviewing the witness before recording the witness's statement. Although the fact of a "pre-interview" was not itself concealed, the content of the "pre-interview" was not disclosed to the extent it was inconsistent with the subsequent, recorded statement. In this way, the "pre-interview" would shape the contours of the "formal" recorded statement for the purpose of enhancing the apparent reliability of a witness's statement of identification.

137. Neverdon, Thanner, and Patton also fabricated and maintained a false investigative narrative that Mr. Barfield was the armed "Monk" who shot Davis, despite the recovery and forensic match of the murder weapon recovered from Lawrence.

138. Bohlen fabricated or maintained a false forensic record by failing to disclose, concealing, or omitting the existence and significance of the firearms match, and by allowing the case to proceed as if BPD had not recovered the murder weapon. Upon information and belief,

Bohlen falsely stated to the prosecutor that she did not have a firearm against which to compare the cartridge casings recovered from the Davis homicide scene. Upon information and belief, Bohlen made the false statement in response to a request for existing evidence or reports.

139. The fabricated and misleading evidence influenced Mr. Barfield's prosecution, trial, conviction, and continued imprisonment.

140. The right not to be deprived of liberty based on fabricated evidence or materially misleading evidence created by government investigators was clearly established at all relevant times.

141. As a direct and proximate result of the Individual Defendants' misconduct, Mr. Barfield suffered loss of liberty, physical injury, emotional distress, reputational harm, and other damages.

142. The misconduct described in this Count was intentional, malicious, reckless, and undertaken with willful indifference to Mr. Barfield's constitutional rights.

**COUNT III - 42 U.S.C. Section 1983**

**Malicious Prosecution / Unreasonable Seizure Pursuant to Legal Process**

**(Against Individual Defendants)**

143. Each preceding paragraph is incorporated as if fully restated herein.

144. The Individual Defendants caused and continued Mr. Barfield's seizure pursuant to legal process unsupported by probable cause.

145. Neverdon, Thanner, and Patton caused the institution and continuation of criminal proceedings by supplying and relying on contaminated identifications, omitting exculpatory information, and presenting a misleading case file to prosecutors and the court.

146. Neverdon, Thanner, Patton, and Bohlen caused the continuation of the prosecution and seizure by suppressing the firearms match and related evidence that undermined probable cause after BPD recovered the murder weapon from Lawrence.

147. Considering the identification evidence without the alleged falsifications and with the material information the defendants concealed, including the recovery and forensic matching of the pistol obtained from Lawrence, the evidence known to the Individual Defendants did not establish probable cause to continue Mr. Barfield's detention and prosecution.

148. The criminal proceedings terminated in Mr. Barfield's favor when the Circuit Court vacated his conviction and sentence, ordered a new trial, and the Baltimore City State's Attorney's Office entered a nolle prosequi to the only remaining count.

149. The Individual Defendants acted maliciously, intentionally, recklessly, and without probable cause.

150. As a direct and proximate result, Mr. Barfield was wrongfully arrested, detained, prosecuted, convicted, and imprisoned, and suffered the damages alleged herein.

**COUNT IV - 42 U.S.C. Section 1983**

**Detention Without Probable Cause**

**(Against Individual Defendants)**

151. Each preceding paragraph is incorporated as if fully restated herein.

152. The Individual Defendants caused Mr. Barfield to be detained without probable cause in violation of the Fourth and Fourteenth Amendments.

153. Mr. Barfield's detention was caused by contaminated and misleading identification evidence, suppression of exculpatory evidence, and concealment of the firearms match and Lawrence evidence.

154. At a minimum, after BPD recovered the murder weapon from Lawrence and matched it to the Davis shell casings, probable cause to detain Mr. Barfield was vitiated or materially undermined.

155. The Individual Defendants had a duty and a realistic opportunity to disclose the information that negated or undermined probable cause, but failed to do so.

156. As a direct and proximate result, Mr. Barfield was deprived of liberty and suffered the damages alleged herein.

157. The Individual Defendants' misconduct was objectively unreasonable, intentional, malicious, reckless, and undertaken with willful indifference to Mr. Barfield's rights.

**COUNT V - 42 U.S.C. Section 1983**

**Failure to Intervene**

**(Against Individual Defendants)**

158. Each preceding paragraph is incorporated as if fully restated herein.

159. One or more Individual Defendants knew that other Individual Defendants were violating Mr. Barfield's constitutional rights by suppressing exculpatory evidence, fabricating or maintaining misleading evidence, using contaminated identifications, and causing detention without probable cause.

160. One or more Individual Defendants had a reasonable opportunity to intervene to prevent or end those violations by disclosing the recovered murder weapon, firearms match, Lawrence information, Hall letter, identification-contamination facts, and related records to prosecutors, defense counsel, courts, supervisors, or other officials.

161. The Individual Defendants failed to intervene despite their ability and obligation to do so.

162. As a direct and proximate result of the failure to intervene, Mr. Barfield was wrongfully prosecuted, convicted, imprisoned, and injured as alleged herein.

163. The misconduct described in this Count was intentional, malicious, reckless, and undertaken with willful indifference to Mr. Barfield's clearly established rights.

**COUNT VI - 42 U.S.C. Section 1983**

**Conspiracy to Deprive Constitutional Rights**

**(Against Individual Defendants)**

164. Each preceding paragraph is incorporated as if fully restated herein.

165. The Individual Defendants reached an agreement, understanding, or meeting of the minds to deprive Mr. Barfield of his constitutional rights, including his rights to due process, a fair trial, disclosure of exculpatory evidence, freedom from fabricated evidence, and freedom from seizure and detention without probable cause.

166. This Count rests on an agreement and overt acts to suppress physical and documentary evidence independently of any protected testimony or preparation to testify. It included pretrial and extrajudicial acts to suppress physical and documentary evidence by not providing the prosecution and defense with the signed reports identifying the murder weapon, concealing the reports about the recovered murder weapon, omitting the firearms match from the disclosed case materials, and maintaining a false prosecution theory.

167. Overt acts in furtherance of the conspiracy included examining and documenting the murder weapon; preparing, receiving, routing, reviewing, or possessing the firearms comparison report; failing to disclose that report; failing to disclose Lawrence; failing to correct the false premise that the murder weapon had not been recovered; failing to disclose the Hall letter

and identification-contamination information; and causing the prosecution to proceed on a misleading record.

168. The conspiracy caused the prosecution, conviction, and continued imprisonment of Mr. Barfield.

169. As a direct and proximate result of the conspiracy, Mr. Barfield suffered the damages alleged herein.

170. The Individual Defendants acted intentionally, maliciously, recklessly, and with willful indifference to Mr. Barfield's clearly established constitutional rights.

**COUNT VII - 42 U.S.C. Section 1983**

**Municipal Liability Under Monell**

**(Against BPD)**

171. Each preceding paragraph is incorporated as if fully restated herein.

172. The constitutional violations described in this Complaint were caused by BPD policies, practices, customs, and failures to train, supervise, discipline, and control its employees.

173. BPD maintained a policy, practice, or custom of suppressing exculpatory and impeachment evidence, failing to document and disclose material witness information, failing to maintain complete homicide files, and failing to transmit all material police and forensic information to prosecutors and the defense.

174. BPD maintained a policy, practice, or custom of permitting suspect-focused homicide investigations, contaminated identification procedures, and reliance on unreliable witness evidence without proper disclosure of the facts undermining that evidence.

175. BPD maintained a policy, practice, or custom of failing to train and supervise forensic examiners and laboratory employees concerning Brady obligations, forensic disclosure

obligations, documentation, and coordination between laboratory files, property files, and homicide files.

176. BPD failed to discipline employees who suppressed evidence, buried reports, fabricated or maintained misleading evidence, used suggestive identification procedures, or failed to disclose Brady material, thereby ratifying and encouraging the misconduct.

177. On information and belief, before and during the 1997-1998 investigation and prosecution of Mr. Barfield, BPD policymakers had actual or constructive knowledge of these customs and failures from prior cases, complaints, exonerations, internal experience, obvious recurring risks, and the later-documented disarray of the Homicide Unit. The later Tabeling Report corroborates the alleged institutional deficiencies and, together with the earlier incidents and practices, supports the allegation that the relevant deficiencies were persistent rather than confined to Mr. Barfield's case.

178. BPD policymakers were deliberately indifferent to the known and obvious risk that these policies, customs, and failures would cause wrongful prosecutions and convictions.

179. The policies, customs, and failures described above were the moving force behind the violations of Mr. Barfield's constitutional rights.

180. As a direct and proximate result, Mr. Barfield was wrongfully prosecuted, convicted, imprisoned, and injured as alleged herein.

**COUNT VIII - Maryland Common Law**

**Malicious Prosecution**

**(Against Individual Defendants)**

181. Each preceding paragraph is incorporated as if fully restated herein.

182. The Individual Defendants instituted, caused, and continued criminal proceedings against Mr. Barfield.

183. The criminal proceedings terminated in Mr. Barfield's favor when his conviction and sentence were vacated, a new trial was ordered, and the Baltimore City State's Attorney entered a nolle prosequi to the only remaining count.

184. The Individual Defendants lacked probable cause to institute or continue the proceedings, particularly after BPD recovered the pistol from Lawrence and matched it to the cartridge casings recovered at the Davis murder scene.

185. The Individual Defendants acted with malice, including by suppressing exculpatory evidence, maintaining a false case theory, and causing Mr. Barfield to be prosecuted and imprisoned despite evidence pointing away from him.

186. As a direct and proximate result, Mr. Barfield suffered the damages alleged herein.

**COUNT IX - Maryland Declaration of Rights**

**Article 24 - Due Process**

**(Against Individual Defendants)**

187. Each preceding paragraph is incorporated as if fully restated herein.

188. The Individual Defendants violated Article 24 of the Maryland Declaration of Rights by suppressing exculpatory and impeachment evidence, fabricating or maintaining misleading evidence, using contaminated and unreliable identification evidence, and depriving Mr. Barfield of a fair trial and liberty without due process of law.

189. The Individual Defendants' conduct was intentional, malicious, reckless, and undertaken with willful indifference to Mr. Barfield's rights.

190. As a direct and proximate result, Mr. Barfield suffered the damages alleged herein.

**COUNT X - Maryland Declaration of Rights**

**Article 26 - Unreasonable Seizure and Detention**

**(Against Individual Defendants)**

191. Each preceding paragraph is incorporated as if fully restated herein.

192. The Individual Defendants violated Article 26 of the Maryland Declaration of Rights by causing Mr. Barfield to be arrested, seized, detained, prosecuted, and imprisoned without probable cause and pursuant to misleading legal process.

193. The Individual Defendants' conduct was objectively unreasonable, intentional, malicious, reckless, and undertaken with willful indifference to Mr. Barfield's rights.

194. As a direct and proximate result, Mr. Barfield suffered the damages alleged herein.

**COUNT XI - Maryland Common Law**

**Civil Conspiracy**

**(Against Individual Defendants)**

195. Each preceding paragraph is incorporated as if fully restated herein.

196. The Individual Defendants acted in concert and agreed to accomplish unlawful acts or lawful acts by unlawful means, including malicious prosecution, suppression of exculpatory evidence, concealment of the recovered murder weapon, fabrication or maintenance of misleading evidence, and intentional infliction of emotional distress.

197. The Individual Defendants committed overt acts in furtherance of the conspiracy, including the acts alleged throughout this Complaint.

198. The Individual Defendants acted with malice and with the purpose of causing or continuing Mr. Barfield's prosecution, conviction, and imprisonment.

199. As a direct and proximate result of the conspiracy and underlying tortious conduct, Mr. Barfield suffered the damages alleged herein.

**COUNT XII - Maryland Common Law**

**Intentional Infliction of Emotional Distress**

**(Against Individual Defendants)**

200. Each preceding paragraph is incorporated as if fully restated herein.

201. The Individual Defendants' conduct was intentional or reckless.

202. The Individual Defendants' conduct was extreme and outrageous. They abused governmental authority to cause the prosecution and imprisonment of an innocent man while suppressing evidence that would have exposed his innocence and undermined the case against him.

203. The Individual Defendants intended to cause emotional distress or acted with reckless disregard of the near certainty that their conduct would cause severe emotional distress.

204. Mr. Barfield suffered severe emotional distress as a direct and proximate result of the Individual Defendants' conduct, including the psychological and emotional injuries alleged herein.

205. The Individual Defendants' conduct was malicious, willful, wanton, and in reckless disregard of Mr. Barfield's rights.

**COUNT XIII - Maryland Law**

**False Imprisonment**

**(Against Neverdon, Thanner, and Patton)**

206. Each preceding paragraph is incorporated as if fully restated herein.

207. Defendants Neverdon, Thanner, and Patton deprived Mr. Barfield of his liberty without his consent and without legal justification.

208. Defendants Neverdon, Thanner, and Patton acted outside of their legal authority when they caused the arrest of Mr. Barfield.

209. As a direct and proximate result of the false imprisonment alleged in this Count and underlying tortious conduct, Mr. Barfield suffered the damages alleged herein.

**COUNT XIV - Maryland Law**

**Indemnification**

**(Against BPD)**

210. Each preceding paragraph is incorporated as if fully restated herein.

211. At all relevant times, the Individual Defendants were employees, agents, or personnel of BPD and acted within the scope of their employment.

212. Under applicable Maryland law, BPD is obligated to indemnify, pay, or satisfy judgments for compensatory damages entered against its employees or personnel for acts or omissions committed within the scope of employment, subject to any applicable statutory limits and requirements.

213. Nothing in this Count limits, reduces, or waives Plaintiff's federal remedies under 42 U.S.C. § 1983, including compensatory damages, punitive damages against individual defendants, attorneys' fees under 42 U.S.C. § 1988, or direct municipal liability under Monell. This Count seeks only such indemnification as Maryland law requires for judgments entered against BPD employees acting within the scope of employment.

214. BPD is therefore liable to indemnify the Individual Defendants for compensatory damages awarded to Mr. Barfield to the extent required by law.

**Prayer for Relief**

WHEREFORE, Plaintiff Tarrone Barfield respectfully requests that this Court:

a. Award compensatory damages against Defendants, jointly and severally, in an amount to be determined by the jury;

b. Award punitive damages against the Individual Defendants in an amount sufficient to punish and deter their misconduct;

c. Award attorneys' fees and costs pursuant to 42 U.S.C. Section 1988 and any other applicable law;

d. Award pre-judgment and post-judgment interest as allowed by law;

e. Enter judgment declaring that BPD is obligated to indemnify, pay, or satisfy compensatory judgments as required by law; and

f. Grant such other and further relief as the Court deems just and proper.

**Jury Demand**

Plaintiff demands a trial by jury on all issues so triable.

Date: September 17, 2026

Respectfully submitted,

/s/ James P. Ulwick (Bar No. 00536)
julwick@kg-law.com

/s/ David J. Shuster (Bar No. 23120)
dshuster@kg-law.com

/s/ Isabelle Raquin (Bar No. 20267)
iraquin@kg-law.com

/s/ Stephen B. Mercer (Bar No. 12855)
smercer@kg-law.com

KRAMON & GRAHAM, P.A.
750 East Pratt Street
Suite 1100
Baltimore, Maryland 21202
(410) 752-6030

*Counsel for Plaintiff*
*Tarrone Barfield*